**BUFFALO VALLEY TELEPHONE COMPANY, Conestoga Telephone and Telegraph Company, and Denver and Ephrata Telephone and Telegraph Company, Petitioners**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

**Irwin A. Popowsky, Consumer Advocate, Petitioner**

v.

**Pennsylvania Public Utility Commission, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 14, 2009.
Decided Dec. 15, 2009.
Publication Ordered Feb. 16, 2010.

Norman J. Kennard, Harrisburg, for petitioner, Buffalo Valley Telephone Company.

Elizabeth H. Barnes, Asst. Counsel, Harrisburg, for respondent.

Suzan DeBusk Paiva, Philadelphia, for intervenor, Verizon, Pennsylvania, Inc.

Steven C. Gray, Harrisburg, for intervenor, Office of Small Business Advocate.

Joel H. Cheskis, Harrisburg, for intervenor, Office of Consumer Advocate.

BEFORE: McGINLEY, Judge, and COHN JUBELIRER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge McGINLEY.

Buffalo Valley Telephone Company, Conestoga Telephone and Telegraph Company and Denver and Ephrata Telephone and Telegraph Company (hereinafter "Petitioners") are three small local exchange carriers (LECs) that serve rural territories in Pennsylvania. Petitioners request this Court to review[1] three orders of the Public Utility Commission (Commission) concerning their "2006 Annual Price Stability Index/Service Price Index Filings" filed pursuant to the modifications and amendments to Chapter 30[2] of the Public Utility Code, 66 Pa.C.S. § 3015 (hereinafter "Act 183"). This dispute centers around whether Petitioners have the right to increase "noncompetitive" rates for "switched access services" charged to long-distance telephone companies, such as Verizon.[3] The crux of the controversy involves Petitioners' right to increase these switched access charges (which generate noncompetitive revenue for Petitioners) and the Commission's authority to preclude them from doing so. Further, Petitioners challenge the Commission's directive that Petitioners must increase rates charged to their end-user/customers, not the rates charged to other carriers, if they wish to raise revenues. The Commis-

---

1. Irwin A. Popowsky, Office of Consumer Advocate (OCA), has filed a Petition for Review at No. 940 C.D. 2008, which has been consolidated with Petitioners' appeal.

2. Chapter 30 of the Public Utility Code was substantially modified and re-enacted through

Act 183 of 2004, P.L. 1398, 66 Pa.C.S. §§ 3011–3019 ("Act 183").

3. Verizon Pennsylvania, Inc. (Verizon), a customer that pays Petitioners switched access charges, petitioned to intervene on November 27, 2006.

sion's waiver of an $18 residential rate cap to make possible such an increase in Petitioners' revenue is likewise challenged on the grounds that the Commission exceeded its authority under Act 183.

To resolve the issues, it is necessary to understand switched access charges, the statutory background of Chapter 30 of the PUC Code entitled "Alternative Form of Regulation," 66 Pa.C.S. §§ 3001–3009 (repealed), and the amendments to Chapter 30 enacted under Act 183, 66 Pa.C.S. §§ 3010–3019.

### Switched Access Charges—A Source of Noncompetitive Revenue

Switched access charges refer to amounts rural LECs charge to long-distance companies, such as Verizon, to carry non-local calls on their local networks to and from their local customers. It is compensation paid by long distance carriers to rural LECs, like Petitioners, for the use of their network and local switching facilities.[4] Switched access charges are designed to recover a portion of the loop and switching costs of rural LECs.

Because switched access is provided from one telephone company to another, it is considered to be a "noncompetitive service." A "noncompetitive service" is one that telephone companies do not compete to provide, unlike like toll rates which are a competitive service.

### Chapter 30 of the PUC Code— Alternative Regulation Plans

Chapter 30 of the PUC Code was enacted in July 1993, to encourage the deployment of an advanced broadband communications network which would be affordable and universally available to all residents in this Commonwealth. Chapter 30 offered financial incentives to smaller rural LECs, such as Petitioners, to convert their existing communication networks to 100% broadband capability by the end of the year 2015. As inducement, Chapter 30 provided rural LECs the opportunity to be regulated under what is referred to as an "alternative form of regulation." That is, they could elect to have their rates regulated under a price cap formula instead of the traditional rate based/rate of return regulation. If a rural LEC opted to be regulated under the new "alternative form of regulation," it was permitted to adjust its rates annually at the rate of inflation, offset by a 2% productivity factor. This offered rural LECs an opportunity for substantial revenue. Chapter 30 also provided LECs with a "streamlined regulation" designed to reduce numerous regulatory obligations and decrease regulatory delays and costs.

Petitioners elected to be regulated under the new "alternative form of regulation" and committed to make broadband service available to all customers by December 31, 2015. Petitioners' Chapter 30 Network Modernization Plans were initially approved by the Commission in January 2000.

### The Global Order, Rate Rebalancing and the History of the PaUSF

Historically, switched access rates were a means of rate support for rural LECs which provided service in higher cost areas with lower populations and longer loop distances over rougher terrains, as opposed to lower cost areas, such as urban areas, with higher populations and shorter

---

4. A typical example of access charge usage is a competitive toll carrier that wants to compete with the incumbent rural LEC for an end-user's toll call business. The toll carrier must pay time and distance sensitive access charges to the rural LEC for access to the local loop facilities that will connect the long-distance carrier with the end-user.

loop distances. Switched access rates were priced above cost in order to subsidize local rates and keep local basic service affordable. In 1997, after the implementation of the federal Telecommunications Act of 1996, 47 U.S.C. § 151, *et seq.,* and around the time of the transition from monopoly to a more competitive environment, the Commission investigated switched access charges to determine if rural LECs were charging long distance carriers more for those services than their cost. Given that competition now existed among rural LECs and long-distance carriers, the Commission was concerned that rural LECs would gain a competitive advantage over long-distance carriers. The Commission invited interested parties, including Verizon and the Rural Telephone Company Coalition, to participate in "Global Settlement Talks." After hearings, the Commission entered a *Global Order* on September 30, 1999, which implemented, among other things, "revenue-neutral rate rebalancing." One of the purposes of revenue-neutral rate rebalancing was to bring switched access rates into line with costs in order to "level the playing field" and foster competition. This required a decrease in switched access charges and an increase in local rates charged to customers.

In order to avoid rate shock to the rural LECs' end-user customers, the Commission recognized the need to neutralize a rural LEC's revenue shortfalls as the consequence of the ordered reduction of switched access charges. The *Global Order* directed a Pennsylvania Universal Service Fund (PaUSF) be established to enable the rural incumbent LECs to reduce switched access charges and at the same time ensure that residential local service rates did not exceed the designated price cap of $16.00 per month. All Pennsylvania telecommunications providers (except wireless carriers) were directed to contrib-ute to the PaUSF based upon their intrastate end-user revenues. Rural LECs were permitted to draw from the PaUSF to offset their immediate rate rebalancing revenue needs. The *Global Order* described the PaUSF as a "pass-through mechanism to facilitate the transition from a monopoly environment to a competitive environment—an exchange of revenue between telephone companies which attempts to equalize the revenue deficits occasioned by mandated decrease in their toll and access charges." In other words, long distance carriers paid into the PaUSF, and rural LECs withdrew the amount of their revenue deficits that resulted from decreasing switched access rates. Instead of rural LECs charging switched access charges above their costs, the PaUSF subsidized the actual amount of the LECs' revenue deficits. The Commission declared that the PaUSF was an interim funding mechanism to operate during the period of access charge reform. According to the *Global Order,* the PaUSF was originally scheduled to expire on December 31, 2003. In 2003, the PaUSF was extended to allow additional time to consider rate issues and modifications of fund regulations.

### *2003 Joint Stipulation*

Three years after the *Global Order,* the Commission revisited switched access charges and the PaUSF for rural LECs. The 2003 Joint Stipulation Order filed by various parties, including Petitioners, was approved by the Commission. The Commission further reduced switched access charges for LECs and increased the cap on basic local service rates from $16.00 to $18.00. *Access Charge Investigation per Global Order of September 30, 1999,* Docket No. M00021596, 2003 WL 21921043 (Opinion and Order entered July 15, 2003). Joint Supplemental Appendix, Exhibit "I".

If a rural LEC's average residential rate exceeded the $18 cap, as a result of the rate rebalancing, it was required to cap it at $18 and recover the shortfall from the PaUSF.

Subsequently, the Commission opened another investigation into whether switched access charges and total rates in rural areas should be even further decreased. The investigation was to provide the basis for any proposed regulatory changes. The matter was assigned to an Administrative Law Judge (ALJ) for proceedings to determine, *inter alia*, whether access charges should be further reduced and whether disbursements from the PaUSF should be reduced and/or eliminated. *Investigation Regarding Intrastate Access Charges and IntraLATA Toll Rates of Rural Carriers and the Pennsylvania Universal Service Fund*, Docket No. 1–00040105 (Opinion and Order entered December 20, 2004). Joint Supplement Appendix, Exhibit "L."[5]

### *New Chapter 30 (Act 183)—Approval of Petitioners' Amended Plans*

On November 30, 2004, the General Assembly modified Chapter 30 through the passage of Act 183.[6] The primary purpose of Act 183 was to provide rural LECs the incentive to accelerate their universal broadband service by up to 7 years without jeopardizing affordability. In other words, additional incentives were offered to persuade rural LECs to hasten the modernization of their networks.

One inducement for such acceleration was an increased revenue opportunity through the reduction or elimination of the 2% inflation offset, i.e., a rural LEC which committed to accelerate broadband availability to 100% of its customers was allowed to reduce and/or eliminate the previous 2% inflation offset. This modification of the price cap formula allowed the LEC's revenues to increase at the rate of inflation. 66 Pa.C.S. § 3015(a)(1).

Pursuant to these provisions, Petitioners elected to accelerate their universal broadband availability beginning December 31, 2008. On February 25, 2005, Petitioners filed their Amended Alternative Regulation and Network Modernization Plans (Amended Plans) and served them on Office of Consumer Advocate (OCA) and Office of Small Business Advocate (OSBA).[7] Interested parties were permitted to file comments. In keeping with the concept of deregulation, the Amended Plans provided that *"competitive"* services "shall not be regulated on any basis including as to rates, tolls, charges rates structures rate base, rate of returns or earnings." Petitioners were free to price *"competitive"* services at their discretion.

The Amended Plans allowed for a restructuring of rates on a revenue-neutral basis so long as local rates were not in-

**5.** By order entered August 20, 2005, the Commission stayed the investigation pending the Federal Communications Commission's (FCC) ruling on its Unified Intercarrier Compensation proceeding. The FCC had initiated its own access charge and universal service reform. The Commission determined that a stay was appropriate in light of the pending changes at the federal level on related issues and the possibility of preemption or other impact the FCC proceeding might have on state action and reform. *Investigation Regarding Intrastate Access Charges and Intra-*

*LATA Toll Rates of Rural Carriers and the Pennsylvania Universal Service Fund*, Docket No. I–00040105, Order and Opinion entered November 15, 2006. Joint Supplemental Index Exhibit "W."

**6.** Sections 3001–3009 were repealed, and new Sections 3010–3019 were created.

**7.** *See* Petitions for Amended Alternative Regulation and Network Modernization Plans of Petitioners, Joint Supplemental Appendix, Exhibits N, P, R.

creased by more than $3.50 per month. Petitioners Amended Plans also, consistent with the July 15, 2003, Joint Stipulation, allowed changes to access service rates in order to ensure each access service rate element recovered its cost. Whenever the Petitioners' SPI (service price index) allowed for an increase, Petitioners were required to provide a cost study to support the change.

With respect to *"noncompetitive"* services (such as the switched access service at issue) the Amended Plans provided that Petitioners "shall not use revenues earned or expenses incurred in conjunction with noncompetitive services to subsidize competitive services."[8] With respect to the "principles and procedures applicable to changes" in Petitioners' rates for *"noncompetitive"* services, the Amended Plan specifically stated that "nothing in this plan shall be construed to limit the requirement of 66 Pa.C.S. § 1301, that rates shall be just and reasonable." *Id.* at 8. The Amended Plans also provided specifically that "all tariff filings for noncompetitive services are subject to review of this Plan" and that "Chapter 13, Sections 1301 (just and reasonable) remain applicable under the provisions of the Plan." *Id.* at 9. Thus, unlike the provisions relating to *"competitive"* services, the Amended Plans reserved the Commission's regulatory oversight over *"noncompetitive"* services to ensure that any proposed changes would further the purposes of Act 183— that noncompetitive or protected services remained reasonable and did not impede the development of competition.

The Commission found the basic tenets of Petitioners' Amended Plans compliant with Act 183 and approved them by orders dated June 3, 2005.

### *Petitioners' First Filings and Associated Tariffs Pursuant to the Amended Plans—Commission's June 23, 2006 Order*

On April 28, 2006, Petitioners filed their first annual Price Stability Index/Service Price Index Filings and associated tariffs to effectuate increases to local and access revenues pursuant to their approved Amended Plans. Petitioners' inflation offset was reduced from 2% to 0%. Petitioners proposed, though tariffs, to raise revenues by increasing (1) switched access service rates; and (2) increases to non-basic local service rates. Ninety-nine percent of these increases were allocated to increases in switched access service rates charged to other carriers, while one percent was allocated to increases in non-basic local service rates charged to customers.

In an Order dated June 23, 2006, the Commission permitted the implementation of the proposed rate changes. The Commission, however, voiced its concern about the increase in intrastate switched access charges and observed that the proposed increase was contrary to "the industry trend to move in the opposite direction by reducing access service charges so that they are closer to their actual cost."[9] The Commission noted that Petitioners' proposal to increase access rates was a departure from the current practice by LECs to recover revenue increases from

---

**8.** *See e.g.* Amended Streamlined Form of Regulation and Network Modernization Plan of Buffalo Valley Telephone Company, Joint Supplemental Exhibit N at 7.

**9.** Buffalo Valley Telephone Company Supplement No. 54 to Tariff PA PUC No. 7, Supplement No. 8 to Tariff PA PUC No., 8, 2006

Annual Price Stability Index/Service Price Index Filing of Buffalo Valley Telephone Company, Docket Nos. R–00061375 and P–00981428F1000, Order entered June 23, 2006, at 3. Joint Supplemental Appendix Exhibit "T."

local service rates or bank them for future increases. Accordingly, the Commission gave Petitioners three alternatives: to either (1) "bank" the remaining allowable revenue increases to their basic local exchange service rates, rather than to apply the increases to their access charges; (2) allocate the remaining allowable revenue increases to their basic local exchange service rates, rather than to apply the increases to their switched access charges; and (3) effectuate the proposed rate increases for switched access charges, subject to any final determinations on access reform, including the Commission's pending Rural Telephone Company Access Charge Investigation at Docket No. 1–00040105.

Petitioners filed a Motion for Reconsideration requesting the Commission to: (1) recall its "criticisms" against Petitioners for raising switched access charges; and (2) reverse the mandated changes to the manner in which Petitioners calculated their Price Stability Index (PSI) formula.[10]

At this point, Verizon intervened and filed a Response to Petitioners' Motion for Reconsideration, Amicus Curiae, pursuant to 52 Pa.Code § 5.502(d). Verizon argued that Petitioners' proposed switched access rate increases were much higher than those accessed by Verizon on other carriers, and if Verizon was forced to pay these increased access charges, it would in effect, be providing a "double subsidy" to Petitioners; the first is the form of exorbitant access rate charges, and the second in the form of its contributions to the PaUSF. Verizon argued that if Petitioners were allowed to increase their access rates, it was necessary to revisit the need for the PaUSF.

Upon reconsideration, the Commission decided to investigate the switched access charge increases and assigned the matter to an ALJ for a recommended decision.

### Hearing Before the ALJ

At the hearing before the ALJ, Petitioners, Verizon, the OCA and the OSBA presented approximately 1,000 pages of pre-written proprietary witness testimony and exhibits.

Petitioners offered the testimony of Leonard J. Beurer (Beurer), Vice President of Regulatory Relations and External Affairs of D & E Communications.

Beurer testified "[t]he D & E Companies [Petitioners] firmly recognize that it has been the objective of this PaPUC to reduce intrastate access charges." Direct Testimony of Leonard J. Beurer (Beurer Direct Testimony) at 28; Reproduced Record (R.R.) at 56a. Beurer, however, pointed out that neither former Act 30 nor Act 183 prohibited rural LECs from increasing access rates. Beurer Direct Testimony at 42; R.R. at 70a. He also stressed that there was no limitation on Petitioners' right to increase access charges in their Amended Plans. He opined that Petitioners had an absolute right to the rate changes in the June 28 Compliance Filings as long as Petitioners' access charges mirrored their interstate charges, their carrier charges remained below the Global benchmark, and the changes did not violate the Amended Plans' provisions. Beurer Direct Testimony at 49; R.R. at 77a.

Petitioners provided "cost data" to support their proposed rate changes. Specifically, Beurer explained that the National Exchange Carrier Association (NECA) proxy cost model demonstrated that Petitioners' access charges were below their

---

10. The PSI determines the allowance change (increase or decrease) in rates for noncompetitive services. Petitioners proposed to increase switched access rates to increase their allowable noncompetitive revenue via this formula.

cost. According to Beurer, the NECA proxy cost model, which is used to identify *inter*state switched access and common line costs, may be used to determine *intra*state carrier charge costs. Beurer provided a chart, Exhibit 6 to Beurer's Testimony, which he claimed proved that *intra*state carrier charge rates were below Petitioners' *inter*state costs. Beurer Direct Testimony at 58; R.R. at 86a.

Verizon presented Don Price (Price), Director of State Regulatory Pricing Policy, Regulatory and Litigation Department. Price testified that Petitioners' switched access rate increases conflicted with the Commission's longstanding policies with respect to competition, universal service and access rates. He opined that Petitioners could have allocated the increased revenue to basic rates if they spread them evenly across their access lines or to other noncompetitive services. Direct Testimony of Don Price (Price Direct Testimony) at 6; R.R. at 193a. Price explained that Verizon's own access charges were roughly one third of Petitioners' switching charges. He noted that Verizon was an access charge customer of Petitioners and according to the proposed increase would pay almost $5 million in access charges to Petitioners. Price Direct Testimony at 9–10; R.R. at 196a–197a. Price believed that Petitioners' increases should be rescinded pending the completion of the Commission's investigation of rural carrier access charges at Docket No. I–00040105 because, among other things, (1) the Petitioners increases threatened the balance achieved by the Commission's integrated approach to resolving issues of local competition, universal service and switched access rate reform and efforts to lessen or eliminate these historical subsidy flows; (2) even though Verizon reduced its switched access charges it would be forced to pay Petitioners' increased switched access charges which was discriminatory; and (3)

switched access charge increases undermined competition by keeping Petitioners' rates artificially low and discouraged would-be competitors from entering those rural markets. Price Direct Testimony at 10; R.R. at 197a.

Price agreed that there was no prohibition in the statute that precluded switched access rate charge increases and there were no Commission orders that froze access rates. However, Price explained that the Commission has a statutory mandate and the authority and responsibility under 66 Pa.C.S. § 3019(h), to adjudicate whether the proposed rate charges were just and reasonable and nondiscriminatory under 66 Pa.C.S. §§ 1301.

On February 22, 2007, following cross-examination of the witnesses, the ALJ recommended that Petitioners be allowed to increase their switched access charges because the increases did not "violat[e] ... a Commission regulation or order." ALJ's Recommended Decision, Conclusion of Law 11 at 30–31. Verizon filed exceptions and the OCA and OSBA filed reply exceptions.

### The PUC's Decision

On appeal, the Commission granted Verizon's exceptions and rejected the ALJ's recommendation and rescinded the June 23, 2006, approval of Petitioners' proposed increase to switched access charges. The Commission specifically found that Petitioners' access charges were already excessive, above cost and higher than rates charged by others for the same service. The Commission rejected Petitioners' reliance on data obtained from the NECA Proxy Cost Model to justify their switched access charges. The Commission questioned the propriety of the NECA Proxy Cost Model for use by small carriers to demonstrate actual cost support for access rates.

According to the Commission, Petitioners' request to raise switched access rates was "unprecedented." It concluded that if Petitioners planned to collect the additional revenue under their alternative regulatory plans, they must do so by increasing rates charged to their own end user customers, not by increasing rates charged to other telephone companies. It was the Commission's position that Petitioners' requests contradicted Pennsylvania's long-standing service reform and its long-standing attempt to reduce local carriers' dependence on switched access service revenues.

### Petitioners' Motion For Reconsideration—Request to Receive Additional Subsidies from the PaUSF

Petitioners petitioned for Reconsideration and clarification of a number of issues. At issue here, is the request of one of the Petitioners, D & E Telephone, for clarification and/or permission to draw additional funding in an amount above the $18 rate caps from the PaUSF.[11] Specifically, D & E Telephone argued it should be allowed to collect from the PaUSF the difference between the necessary residential rate increase (suggested by the Commission) and the $18 residential rate cap. It maintained that if it was forced to increase residential rates to recover revenue, any increases above the $18 cap should be obtained from the PaUSF, not from its residential customers.

Verizon urged the Commission to deny D & E Telephone's request to expand the PaUSF. Verizon stressed that the purpose of the PaUSF was to support access and toll rate reductions, not enable rural LECs to gain overall revenue increases at the expense of long distance carriers who would be required to contribute even more money into the PaUSF.

In an order entered December 7, 2007, the Commission denied Petitioners' request because it was contrary to the objective of the PaUSF. It reasoned: "this Commission has never permitted a telephone company to obtain PaUSF support for those local rates that go above the benchmark/cap rate support when the local rate increases are a result of PCI/PSI rate increases filings that do not involve any corresponding toll or access charge reductions." Commission Opinion and Order, December 7, 2007, at 21, n. 16. Nevertheless in order to accommodate and offer Petitioners some form of relief, the Commission waived the $18 cap on residential basic local exchange services so that additional revenue could be recovered from local exchange service customers. The Commission again instructed Petitioners that if they wished to collect the additional revenue to which they were entitled under their alternative regulation plans, they were required to do so by increasing rates charged to their own end-user customers instead of increasing subsidies from other telephone carriers either through increased switched access rates or additional payments from the PaUSF.

### Petitioners' Appeal

On appeal, Petitioners raise six issues. Two of those issues relate to the Commission's decision not to allow Petitioners to increase switched access rates. One issue involves the Commission's refusal to reimburse Petitioners from the PaUSF. And three issues relate to the Commission's decision to waive the $18 cap on residential basic local exchange service as a means for Petitioners to raise additional revenue.

---

11. The other Petitioners, Buffalo Valley and Conestoga, did not request this relief because they proposed to bank those revenues that were previously included in increased access rates rather than apply those revenues to local service rate increases.

### This Court's Standard of Review

■ Appellate review of an order of the Commission is limited to (1) determining whether a constitutional violation or error in procedure has occurred; (2) the decision is in accordance with the law; and (3) the necessary findings are supported by substantial evidence. *PECO Energy Company v. Pennsylvania Public Utility Commission*, 568 Pa. 39, 46, 791 A.2d 1155, 1160 (2002).

■ When reviewing an order of the Commission, this Court must not substitute its own judgment for that of the Commission when substantial evidence supports the Commission's decision on a matter within the Commission's expertise. *Popowsky v. Pennsylvania Public Utility*, 550 Pa. 449, 706 A.2d 1197 (1997). This

Court will not "indulge in the process of weighing evidence and resolving conflicting testimony." *Johnstown–Pittsburgh Express, Inc. v. Pennsylvania Public Utility Commission*, 5 Pa.Cmwlth. 521, 291 A.2d 545, 547 (1972).

■ In addition, the Commission's expert interpretation of an aspect of utility law is entitled to great deference and will not be reversed unless clearly erroneous. Judicial deference to the views of the agency when implementing a statutory scheme is necessary, especially when the scheme is complex. *Popowsky.* The Commission's administrative expertise includes the interpretation of its regulations and governing statutes. *Aronson v. Pennsylvania Public Utility Commission*, 740 A.2d 1208 (Pa.Cmwlth.1999).[12]

**12.** In *Popowsky*, a decision of this Court was reversed, in part, because this Court exceeded its scope of review and invaded the Commission's area of expertise and role as factfinder. That case involved the Commission's interpretation and application of alternative regulation plans under former Chapter 30 of the PUC Code.

There, the Commission had approved Bell Atlantic's alternative regulation plan, price stability mechanism, with modifications, based on its conclusion that Bell's rates were just, reasonable, and non-discriminatory. The Commission also concluded that the six services proposed by Bell in its network modernization plan were "competitive services" that were, consequently, eligible for deregulation.

On review, this Court vacated the part of the order where the Commission set Bell's inflation offset at 2.93% and remanded the matter to the Commission for recalculation of price stability formula which included an "input price differential." *Popowsky*, 550 Pa. at 455, 706 A.2d at 1199. This Court had also rejected the Commission's classification of various services as "competitive" because the Commission had not first found that "statutory competitive safeguards had been met." *Popowsky*, 550 Pa. at 455, 706 A.2d at 1200.

Our Supreme Court first concluded that the Commission's determination was supported by substantial evidence and that this Court

had erroneously substituted its judgment for that of the Commission when it injected an input price differential into the price stability mechanism. According to the Supreme Court:

> The PUC decision to utilize a price cap formula which excluded an input price differential is supported by the evidence. The state consumer advocate and the Pennsylvania Cable Television Association, two challengers to the Bell petition and plan, claimed that the price of inputs for telecommunications companies did not increase as fast as the inputs in the economy across the board, and that the inflation offset should be increased in recognition of the differential. Nevertheless, Bell produced substantial evidence which supports the PUC's rejection of an input price differential in the price cap formula.
>
> Briefly stated, the PUC observed that the consumer advocate and PCTA 'estimate[d] widely divergent values' based on 'similar data sources and timeframes' and therefore rejected their estimates as being unreliable. Bell's expert, on the other hand, testified credibly that a proper analysis showed no statistically significant difference between input prices for the telecommunications industry vis-à-vis the national economy.

## I.

### *Did the Commission Lack Statutory Authority to Prohibit Petitioners From Raising Switched Access Charges?*

Petitioners first contend that the Commission had no authority under Act 183 to prohibit them from increasing their switched access charges. Petitioners contend that the Commission's authority over rate changes under Act 183 was limited to determining whether the company correctly calculated the additional revenue permitted by its price change formula and whether the proposed rate change violated an explicit term *of the approved Amended Plans.* Petitioners argue that because their Amended Plans did not prohibit switched access rate increases, the Commission could not create a "new" limitation by disallowing them. Petitioners rely on the following highlighted language in 66 Pa.C.S. §§ 3013(b):

> (b) **Limitations on changes to plans—** Except for changes to existing alternative form of regulation and network modernization plans as authorized by this chapter, *no change to any alternative form of regulation or network modernization plan may be made without the express agreement of both the commission and the local exchange telecommunications company.* (Emphasis added).

Petitioners also rely on the second sentence of 66 Pa.C.S. § 3015(g) to support their position that the Commission lacked authority to impose additional rate change limitations on them:

> (g) **Rate change limitation—**Nothing in this chapter shall be construed to limit the requirement of Section 1301 (relating to rates to be just and reasonable) that rates be just and reasonable. *The annual rate change limitations set forth in a local exchange telecommunications company's effective commission-approved alternative form of regulation plan or any other commission-approved annual rate change limitation shall remain applicable and shall be deemed just and reasonable under section 1301.* (Emphasis added).

Based on these provisions, Petitioners contend that their Amended Plans legally bound the Commission and the Commission lacked authority to disallow a rate increase without Petitioners' express agreement. Petitioners believe the Commission's oversight is "limited to the terms of the plan," specifically, whether rate changes are in compliance with the terms of the previously approved plan. They do not accept that the Commission may reject a proposed increase in rates for noncompetitive services on the ground that such increases are "not just or reasonable."

---

It was proper for the PUC to determine the appropriate inflation offset to be included in Bell's price stability mechanism; it was also proper for the PUC, in making its financial and economic determinations, to disregard proposed incomplete adjustments, such as the input price differential, if the advocates fail to quantify their adjustments properly. *Popowsky*, 550 Pa. at 458–459, 706 A.2d at 1201.

The Supreme Court also found that this Court exceeded its scope of review when it rejected the Commission's statutory interpre-

tation of 66 Pa.C.S. § 3005. The Supreme Court deferred instead to the Commission's interpretation that the classification of a service as "competitive" under 66 Pa.C.S. § 3005(a) did not require competitive safeguards. The Supreme Court noted that the Commission considered the purpose of the statute was to achieve *accelerated* deployment of state-of-the-art telecommunications network and observed "[t]he PUC's interpretation of 66 Pa.C.S. § 3005 is reasonable, and is not clearly erroneous, and therefore should have been sustained." *Popowsky*, 550 Pa. at 462–463, 706 A.2d at 1203.

This is an issue of statutory interpretation. Again, this Court must give deference to the views of the agency when interpreting its governing regulations and statutes. *Aronson.* This Court will only reverse the Commission if its interpretation is unreasonable or clearly erroneous. *Popowsky.*

■ According to the Commission, Petitioners cite these portions of Act 183 too narrowly and out of context. This Court agrees with the Commission that when read in its entirety, Act 183 does not speak in terms of limiting the Commission's authority. To the contrary, the statute expressly preserves the Commission's authority and responsibility to protect all ratepayers and protected services to ensure rates from proposed annual revenue increases are "just and reasonable." This protection extends to services provided to other telephone carriers, i.e., "ratepayers," for Petitioners' switched access service. The General Assembly expressly preserved the Commission's authority to protect ratepayers of noncompetitive and protected services and retained that aspect of the Commission's ratemaking authority that authorized it to ensure that any particular increase was just and reasonable under 66 Pa.C.S. § 1301, even if that increase was proposed as part of an annual price change filing.[13] This interpretation is supported by language the General Assembly inserted throughout Act 183, including language found in the very sections cited by Petitioners, which expressly preserved the Commission's authority to ensure that all proposed rates changes are "just and reasonable." 66 Pa.C.S. § 3015(g) provides:

(g). **Rate change limitation—***Nothing in this chapter shall be construed to limit the requirement of Section 1301 (relating to rates to be just and reasonable) that rates be just and reasonable.* The annual rate change limitations set forth in a local exchange telecommunications company's effective commission-approved alternative form of regulation plan or any other commission-approved annual rate change limitation shall remain applicable and shall be deemed just and reasonable under section 1301. (Emphasis added).

As the Commission persuasively argues, if the General Assembly intended to limit its authority only to determine if a rate change complied with the terms of an alternative regulation plan, there would be no need to preserve the Commission's authority in the first sentence of 66 Pa.C.S. § 3015(g) to ensure these rates remain "just and reasonable."[14]

---

13. The Commission notes that switched access service is specifically defined in the statute as a "noncompetitive" and "protected service" which is covered by the "just and reasonable" standard. 66 Pa.C.S. § 1301 provides:

Every rate made, demanded, or received by any public utility, or by two or more public utilities jointly, shall be just and reasonable and in conformity with regulations or orders of the commission.... (Emphasis added).

14. Similarly, 66 Pa.C.S. § 3019(h) provides that an alternative regulation plan supersedes all conflicting laws relating to rates and ratemaking. However, this section also very distinctly preserved the Commission's authority to make sure that all rates in filings made pursuant to those plans remain just and reasonable.

(h) **Implementation**—The terms of a local exchange telecommunications company's alternative form of regulation plan and network modernization plans shall govern regulation of the local exchange telecommunications company, and consistent with the provisions of this chapter, shall supersede any conflicting provisions or this title or other laws of this Commonwealth and shall specifically supersede all provisions of Chapter 13 .... **other** *than section[] 1301 (relating to*

Other sections of Act 183 support the Commission's position that it retained authority to deny increases to switched access rates in these situations. Under 66 Pa.C.S. § 3017 the Commission has specific authority to rebalance revenue among noncompetitive services by reducing access rates and making revenue neutral increases to other noncompetitive rates. Section 3017 states that "[t]he Commission may not require a local exchange telecommunications company to reduce access rates *except on a revenue neutral basis.*" (Emphasis added). Therefore, Section 3017 envisioned situations where the Commission would require a rural LEC to reduce access rates and provided an independent basis for the Commission to require Petitioners to reduce access rates to their pre–2006 levels on a revenue neutral basis.

This Court also finds that Petitioners misconstrue the phrase "rate change limitations" in 66 Pa.C.S. § 3015(g). A rate change limitation refers to the principles and procedures which are applicable to changes in a rural LEC's rates. These new provisions (alternative form of regulation) replace the provisions of Chapter 13 of the PUC Code that would otherwise govern. For example, Petitioners' Amended Plans provided that Petitioners would use a Price Stability Mechanism as the method for determining noncompetitive rates. Petitioners argue that since their Amended Plans, through the PSM, allowed for *either* an increase or decrease in rates for noncompetitive services, the Commission was obliged to allow any tweak of the elements of the formula and approve *any* increase or decrease. The Commission did not, in fact, add or delete any condition to the Amended Plans. Rather, the Commission examined the substantial increases to switched access rates as compared to the

negligible increases to determine if those proposed changes were just and reasonable. That type of oversight was clearly preserved throughout the Amended Plans which tracked Act 183's method for the proposal, approval and implementation of rate changes and make repeated references to the Commission's authority.

In fact, the Commission's refusal to allow the rate increases was entirely *consistent* with Petitioners' Amended Plans. Without question, the Amended Plans repeatedly refer to the Commission's annual review of a rural LEC's proposed rate changes to make sure they are just and reasonable. For example, for any rate change, the company must file a tariff to implement any required or authorized changes. The Amended Plans specifically stated that all tariff filings for noncompetitive services were "subject to review under the terms of [the] Plan[s] *and that Chapter 13, Sections 1301 through 1305, inclusive, 1309 and 1312, of the Public Utility Code … remain applicable under the provisions of the Plan.*" Actually, the Amended Plans prohibited Petitioners from using revenues earned in conjunction with noncompetitive services to subsidize competitive services, which was exactly what the Commission determined Petitioners did when they raised rates for noncompetitive switched access rates. Thus, this Court does not agree it was ever intended, as Petitioners suggest, that they would be entitled to implement any change they wanted to noncompetitive rates simply because the Amended Plans allowed for either an increase or decrease. Any change was subject to the Commission's approval if it determined, based on its discretion and expertise, that the particular increase was just and reasonable.

*rates to be just and reasonable)* ....

(Emphasis added).

Further, if Petitioners were permitted to implement switched access rates that were above cost then the purpose of Act 183 would be frustrated. The Commission would be powerless to "ensure that rates for protected services do not subsidize the competitive ventures" of Petitioners. The bottom line was that both Act 183 and the Amended Plans preserved the Commission's authority to oversee and regulate rates for noncompetitive services. The Commission would be remiss if it did not ensure these noncompetitive switched access rates were just and reasonable. The Commission continued to retain the authority and responsibility to ensure that noncompetitive rates filed pursuant to an Act 183 Amended Plan were just and reasonable, and in particular to reject proposals that ran contrary to the purpose of the statute.

This Court agrees with the Commission that Petitioners' proposed switched access rate increases were properly reviewed by the Commission according to the clear language of the statute, the terms of Petitioners' Amended Plans and the just and reasonable standard. Accordingly, this Court accepts the Commission's interpretation as reasonable.

## II.

*Was the Commission's Denial of Petitioners' Proposed Switched Access Charge Increases Supported by Substantial Evidence?*

Next, Petitioners argue that the Commission's denial of their switched access charge increases was not supported by substantial evidence. They contend that there was no evidence that their switched access rate increases exceeded costs and

that the NECA proxy model reflected that the access charges did not exceed their cost. The Commission, however, rejected this evidence and called into question the NECA model's use by small carriers to demonstrate actual cost support for access rates.[15] According to Petitioners, the Commission, instead, erroneously relied on a generic access charge increase limitation policy which was not a substitute or the equivalent of substantial evidence.

■ This Court has reviewed the extensive record and concludes that the Commission properly evaluated the testimony and exhibits and that substantial evidence supported the Commission's findings. First, there was ample testimony submitted by Verizon, through Price, that the NECA proxy model was an inappropriate tool to determine Petitioners' actual costs of switched access rates. Price testified that the schedules relied on by Petitioners to establish that its access rates were below cost were not valid. He explained that the NECA schedules related to disbursements, not costs. "According to NECA, the average schedule formulas are designed to 'simulate the disbursements that would be received ... by a [cost study] company that is representative of average schedule companies.'" Price Rebuttal Testimony at 29; R.R. at 314a–315a. He also explained that information relied on by Petitioners was based on an "average scheduled company" and the "average schedule process can hardly be said to represent the costs that a given company actually incurs in providing services." Price Rebuttal Testimony at 29; R.R. at 315a. Price also explained that other carriers charged far less than Petitioners for the same switched access service in Pennsylvania and that Petitioners, themselves,

15. Petitioners had the burden to prove their increased rates were just and reasonable. 66

Pa.C.S. § 3015.

charged less for the same access service in the *inter*state jurisdiction. Based on this evidence, the Commission reasonably came to the conclusion that these other carriers and Petitioners would not be selling access service below cost, which led to its conclusion that Petitioners' much higher *intra*state rates were far above the cost of providing the service.

This Court must also disagree with Petitioners' contention that the Commission erred when it considered the longstanding and well-litigated policy to reduce switched access rates and the reasons for that policy when it conducted its review of the specific evidence. As Verizon points out, beginning with the *Global Order*, the Commission's goal was to reduce the access charges of companies such as Petitioners as a "necessary step[ ] to strive to replace the system of implicit subsidies with 'explicit and sufficient' support mechanisms to attain the goal of universal service in a competitive environment." The Petitioners, themselves, agreed as signatories to the 2003 Settlement that "Pennsylvania should take steps toward implementing access and toll rate reform and begin addressing subsidy levels now." *Access Charge Investigation per Global Order of September 30, 1999*, Docket No. M–00021596, 2003 WL 21921043 (Opinion and Order entered July 15, 2003). Joint Supplemental Appendix, Exhibit "I". This Court in *Bell Atlantic–Pa., Inc. v. Pennsylvania Public Utility Commission*, 763 A.2d 440, 480 (Pa.Cmwlth.2000), *vacated in part on other grounds, MCI WorldCom, Inc. v. Pennsylvania Public Utility Commission*, 577 Pa. 294, 844 A.2d 1239 (2004), approved the Commission's decision to embark on a policy of reducing historically high access rates and shift revenue recovery to basic exchange rates, finding that "[t]he record and the law support the [Commission's] decision to reduce the above-cost access charges in phases, to a

degree now, and then further, pursuant to a future proceeding." Finally, as mentioned infra, at the time Petitioners sought to raise switched access rates, there was an ongoing Commission investigation opened for the precise purpose of considering whether Petitioners' access rates should be *decreased*. The Commission rightly concluded that it was unjust and unreasonable to increase the very rates under investigation, although it did provide Petitioners the opportunity to present evidence to justify their rate increase. It concluded based on the record evidence that Petitioners failed to do so.

This is precisely the kind of controversy where this Court must defer to the Commission because "[r]ate-making questions require the exercise of the [Commission's] expertise, and reviewing courts tend to defer to the [Commission's] exercise of discretion in that area." *Popowsky v. Pennsylvania Public Utility Commission*, 869 A.2d 1144, 1151, n. 17 (Pa.Cmwlth. 2005).

Accordingly, this Court concludes that there was substantial evidence and policy reasons to support the Commission's conclusion that Petitioners' access rates continued to be excessive and priced above cost, and served as a vehicle for other carriers such as Verizon to provide undue implicit subsidies to Petitioners and that it was unjust and unreasonable to permit Petitioners to raise those rates.

### III.

*Did the Commission Err When it Denied the Petitioners PaUSF Support to Maintain Rates at Established Residential Rate Cap Limitations?*

Petitioners next contend that to the extent they chose to increase their residential rates over the alleged rate cap limit, their Amended Plans required the Com-

mission to provide them with increased PaUSF support to cover the difference between the $18 rate cap and local rate increases.[16] They argue that their Amended Plans explicitly authorized them to recover revenues above the $18 residential cap on basic local exchange rates from the PaUSF.

█ The Commission defends its decision and notes that granting Petitioners' request would be a misuse of the fund. Again, the *Global Order,* which established the PaUSF, explained that the PaUSF was an attempt to equalize the revenue deficits occasioned by a mandated decrease in their toll and access charges. It was never anticipated or intended that the PaUSF be used as a means to randomly or otherwise increase revenues absent reciprocal switched access rate reductions. Also, as explained by the Commission, the PaUSF was designed for annual re-evaluation and recalculation because contributing carriers were billed annually and are expected to pay 1/12th of that amount in a flat monthly rate throughout the year. Flat monthly revenues then flow to the rural LEC recipients. The PaUSF was never intended to fund sporadic and unpredictable rate increases such as those proposed by Petitioners.

Further, the Commission contends, regardless of the language in the Amended Plans, the PaUSF regulations found at 52 Pa.Code §§ 63.161–63.171, do not provide for PaUSF reimbursement on the condition that a fund recipient's retail rates exceed any particular benchmark. Rather, the regulations are silent on using the fund for annual revenue increases. If the Legislature or Commission intended that the PaUSF be used generally to fund rate

increases over and above rate caps, it would have expressly stated so.

Again, this Court defers to the Commission's interpretation of its own regulations and prior orders. According to the *Global Order* the PaUSF was created to fund rate increases *tied to access or toll rate reductions.* The Commission was keenly aware of the purpose for which the PaUSF was established, the policy reasons for the PaUSF and its limitations. The issue of whether to expand the current PaUSF to include reimbursement for increased revenues is presently pending before the Office of Administrative Law Judge at the Commission. The Commission's rejection of Petitioners' arguments was based on its conclusion that the PaUSF was available only in the limited situation where a carrier rebalanced revenues by reducing access rates. The Commission's conclusion is supported by the express terms of the *Global Order* which make no mention that the fund was ever intended to subsidize annual alternative revenue increases. Given the language of the regulations, the *Global Order,* and the Commission's pending investigation, this Court concludes that the Commission's refusal to reimburse Petitioners from the PaUSF for rate increases above the $18 rate cap was not clearly erroneous.

## IV.

*Did the Commission err by Waiving the Residential Rate Cap Limitation Contained in Petitioners' Amended Plans?*

Next, Petitioners assert that the Commission erred when it denied recovery from the PaUSF and instead *sua sponte*

---

**16.** Intervenor, OCA, on behalf of the residents, resists any increase to retail rates. Verizon, on the other hand, argues that it is not fair or just to allow Petitioners to increase revenues every year without increasing their retail rates, and instead place the onus of the increases on other carriers to increase their contributions to the PaUSF.

"waived" the rate cap limitation and permitted the entire revenue increase to be placed on Petitioners' local service customers. Petitioners essentially argue that the Commission was not permitted to change codified and agreed upon rate caps. Petitioners once again rely on the second sentence of 66 Pa.C.S. § 3015(g):

> The annual rate change limitations set forth in local exchange telecommunications company's effective Commission-approved alternative form of regulation plan or any other Commission-approved annual rate change limitation shall remain applicable and shall be deemed just and reasonable under section 1301.

■ According to Petitioners, the $18 residential rate cap constitutes an "annual rate change limitation" within the meaning of this section which eliminated the Commission's authority to alter or waive it. Again, Petitioners have taken the untenable position that this section absolutely prohibits the Commission from making changes to any component of a previously filed alternative regulation plan.

The Commission points out that 66 Pa. C.S. § 3015(g) relates to "annual rate change limitations" and that the $16 and $18 rate ceilings are not, and have never been, considered by the Commission to be "annual rate change limitations." The Commission notes that the term "annual rate change limitations" was not defined in the statute and Petitioners have not demonstrated that these rate caps, which were established for a limited duration and for the specific purpose of rate rebalancing, were broad enough to constitute "annual rate change limitations" under this provision. As explained by the Commission,

the rate caps were established in the context of setting parameters for rate rebalancing to reduce switched access rates, not as a broader limitation on the rural LEC's implementation of an annual revenue increase under an alternative regulation plan.[17]

This Court concludes that the Commission's interpretation of the phrase "annual rate change limitations" was reasonable. The rate cap at issue was predetermined by the Commission and remained fixed until it expired by its terms. This Court agrees that the $18 residential rate cap set by the Commission did not constitute an "annual rate change limitation" and there was nothing in 66 Pa.C.S. § 3015(g) which prohibited the Commission from granting a particular carrier a waiver of the cap if it determined such a waiver was necessary to keep rates fair and reasonable.

Further, there is nothing in any case, prior order or statute which prohibited the Commission from modifying the $18 rate cap, for a particular utility, based upon its unique factual circumstances. As the Commission points out, the rate cap was created by the Commission in the *Global Order*. The Commission has, in fact, modified this Commission-created rate cap. See, July 15, 2003, Order.

Again, this Court must defer to the Commission's deference and expertise in the area of rate making. Clearly, as set forth above, the General Assembly preserved throughout Act 183 the Commission's authority to oversee, monitor and curtail, if necessary, an Amended Plan to ensure rates were just and reasonable. In this particular circumstance, the Commission, in response to Petitioners' proposal to

17. The Commission argues that, in any event, the rate caps which Petitioners seek to enforce had explicit expiration dates which lapsed. Accordingly, even if the residential rate caps were deemed as rate change limita-

tions, the Commission reads nothing in 66 Pa.C.S. § 3015(g) which denied its authority to waive or alter the caps that existed prior to the passage of Act 183, based on the facts of a specific case.

increase switched access rates believed it was appropriate and fair to offer Petitioners the opportunity to waive the $18 rate cap as an alternative means to increase revenues rather than raise switched access rates, which it deemed were unjust and unreasonable.

## V.

*Was the Commission's Waiver of the Residential Rate Cap Without Notice and Opportunity to be Heard in Violation of Section 703(g) of the Public Utility Code?*

Petitioners contend that that the Commission's waiver of the rate cap was done *sua sponte* and denied Petitioners the opportunity to be heard and introduce evidence at a hearing. They claim the Commission violated Section 703(g) of the Public Utility Code which provides that the Commission is authorized to rescind or amend a prior order affecting a substantive right only "after notice and after opportunity to be heard." *Armstrong Telecommunications, Inc. v. Pennsylvania Public Utilities Commission,* 835 A.2d 409 (Pa.Cmwlth.2003).

■ The Commission does not agree that its waiver of the rate cap for D & E Telephone constituted a substantive change of a prior order. It reminds the Court that it did not waive rate caps for every carrier. It merely noted that the $18 cap might have expired since the July 15, 2003, Order, stated that it covered the period of January 31, 2004, through December 31, 2006.

The Commission, in a December 7, 2007, Order did recognize that serious questions existed regarding the continued viability of the $18 rate cap. That Order, however, did not finally decide whether the $18 rate cap continued to be in effect. The Commission asserts that it granted a limited waiver of the rate cap to one particular company, i.e., D & E Telephone, and made clear that any more sweeping decisions about the $18 benchmark, and all of the other interrelated issues regarding rural carrier ratemaking and universal service would be addressed in the impending rural carriers' access investigation.

Again, this Court discerns nothing in the Commission's conduct which may be viewed as clearly erroneous. Given familiarity with the financial and economic nuances associated with such a waiver, the Commission was in the best position to determine if the waiver, which was limited in its scope and duration (and which apparently Petitioners elected not to implement anyway), was a minor variance from the rate cap and, therefore, temporarily warranted in these circumstances. In any event, to the extent that the Commission did err, it promptly corrected any error by scheduling an investigation into the issue of whether rate caps should be increased, including the limited waiver for D & E Telephone.

## VI.

*Was the Commission's Waiver of the Residential Rate Cap Supported by Substantial Evidence as to Rate Affordability and Urban Rate Comparability?*

■ Lastly, Petitioners contend that the Commission's waiver of the $18 residential cap rate was not supported by substantial evidence. They argue that local service rates must be both affordable and comparable to urban area rates. They assert that their residential rates would increase to $19.03 and the Commission did not find that these higher rates were affordable and reasonable for Petitioners' customers. Petitioners also rely on Section 254(b) of the federal Telecommunica-

tions Act of 1996, 47 U.S.C. § 254(b), which provided that customers in rural areas must have access to services at rates comparable to rates charged for similar services in urban areas. They assert that the Commission did not make any finding that the higher rates (increased from $18 to $19.03 for residential customers) were reasonable and comparable to rates charged for similar services in urban areas.

The Commission counters by arguing that this federal law pertains to federal universal service and is not a mandate to State Commissions. It is has no bearing on a rural LEC's receipt of monies from the PaUSF. In addition, as previously explained, the Commission's waiver of the residential rate cap for D & E Telephone, to the extent that one still existed, was very limited in scope and duration and was subject to an upcoming investigation where the parties would have an opportunity to present evidence and make arguments. Finally, the Commission's order did not require D & E Telephone to increase the caps during the interim time between the order and the outcome of the investigation. The waiver was put forward by the Commission as an attempt to offer some relief to D & E Telephone to compensate for the Commission's denial of its request to increase switched access rates.

The Commission's decision was amply supported by substantial evidence, the unique circumstances presented by D & E Telephone, pertinent policy considerations, and its plan to resolve this very complicated issue in a related upcoming investigation. This Court will not disturb this rational and well-reasoned decision of the Commission.

For the foregoing reasons, the order of the Commission is affirmed.

Judge COHN JUBELIRER concurs in the result only.

### ORDER

AND NOW, this 15th day of December, 2009, the Orders of the Pennsylvania Public Utility Commission are hereby affirmed.